PEOPLE *v.* KURRLE.

1. EMBEZZLEMENT—TITLE TO FUNDS—COUNTY WELFARE DIRECTOR.
     Director of county welfare department who had been given au-
        thority to settle or compromise all hospital accounts he could
        collect was not guilty of embezzling funds of the department,
        where part of proceeds of check he had contingently received
        in satisfaction of county's lien for a larger amount was used
        for his personal use but sale of property has never been effected
        so as to entitle the department to any of the funds withheld
        by defendant (CL 1948, § 750.174).

2. SAME—TITLE OF CONVERTED PROPERTY.
     The property or money converted by an agent must belong to his
        principal in order to hold the agent guilty of embezzlement
        (CL 1948, § 750.174).

Appeal from Shiawassee; Lyons (Willis L.), J.
Submitted October 16, 1952. (Docket No. 95, Calen-
dar No. 45,404.) Decided December 9, 1952.

Harry Kurrle was convicted of embezzlement. Re-
versed.

*Ralph B. Hoschner,* for appellant.

*Frank G. Millard,* Attorney General, and *Donald
E. Smith,* Prosecuting Attorney, for the people.

SHARPE, J. Defendant, Harry Kurrle, was tried,
convicted and sentenced under an information filed
by virtue of the general embezzlement statute, CL
1948, § 750.174 (Stat Ann § 28.371). He was charged

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 18 Am Jur, Embezzlement § 9.

with having embezzled the sum of $105 from the department of social welfare of Shiawassee county, Michigan.

Defendant, Harry Kurrle, served as welfare director of Shiawassee county from March, 1950, until March 27, 1951, at which time he was suspended and later discharged. At the time defendant became welfare director the case load was approximately 200 families, with relief costing the county between $8,000 and $9,000 per month. Defendant Kurrle was given authority by the welfare board to settle or compromise all hospital accounts that he could collect. He also had supervision of the office, but without authority to hire or discharge an employee. In 1948, one John Allen had borrowed money from the Shiawassee county welfare department, and had signed an agreement to repay this sum in the amount of $688.71. A lien was placed upon Allen's property to secure payment of the loan, although at that time Allen's property was so heavily encumbered that the county welfare lien was of doubtful security. In October, 1950, one W. F. Roby was engaged in the real estate business. He came to see defendant Kurrle for the purpose of finding out how much money it would require to discharge the county welfare lien on Allen's property, as he was interested in purchasing Allen's interest in a small farm where the Allen family lived. As a result of this conference Roby agreed to pay the county welfare department the sum of $325 to settle the Allen account. A check was made out in the above sum, payable to the social welfare department, with a notation "payment in full of the John Allen account." When the check was given to Kurrle, Roby asked Kurrle to hold the check until further notice. Subsequently the check was cashed and $220 was paid to the county welfare department, and the balance of $105 was held by Kurrle, and later deposited by him in his private

bank account. It appears that after the sum of $105 was deposited in Kurrle's bank account, he used some of it for his personal business. After Kurrle's arrest he made out a check in the amount of $105, payable to Roby and the county welfare department. This check was never cashed. The cause came on for trial, resulting in a conviction and sentence of Kurrle.

It also appears that at the close of the people's case, the defendant made a motion to dismiss the case. The record does not disclose any reason given for such dismissal.

Upon leave being granted, Kurrle appeals and urges that the prosecution failed to prove that the sum of $105 was the property of the county welfare department. The statute in question reads as follows: (CL 1948, § 750.174 [Stat Ann § 28.371].)

"Sec. 174. * * * Any person who as the agent, servant or employee of another, or as the trustee, bailee, or custodian of the property of another, or of any partnership, voluntary association, public or private corporation, or of this State, or of any county, city, village, township or school district within this State, shall fraudulently dispose of or convert to his own use, or take or secrete with intent to convert to his own use without the consent of his principal, any money or other personal property of his principal which shall have come to his possession or shall be under his charge or control by virtue of his being such agent, servant, employee, trustee, bailee or custodian, as aforesaid, shall be guilty of the crime of embezzlement, and upon conviction thereof, if the money or personal property so embezzled shall be of the value of 50 dollars or under, shall be guilty of a misdemeanor; if the money or personal property so embezzled be of the value of more than 50 dollars, such person shall be guilty of a felony, punishable by imprisonment

in the State prison not more, than 10 years or by a fine not exceeding 5,000 dollars.

"In any prosecution under this section, the failure, neglect or refusal of such agent, servant, employee, trustee, bailee or custodian to pay, deliver, or refund to his principal such money or property entrusted to his care upon demand shall be prima facie proof of intent to embezzle."

It is the law that before defendant can be convicted of the crime of embezzlement, the property or money converted must belong to the county welfare department, hence it is necessary to examine the testimony in order to determine this issue. Mrs. Allen, a witness produced by the people, testified:

"My full name is Mrs. John Allen and I live at 12428 Peacock road, south of Laingsburg. My husband's name is John Allen. We have lived near Laingsburg about 3 years the 24th of April.

"On the 23d of October, 1950, my husband owed $688.71 to the department of social welfare of Shiawassee county, upon expenses which arose out of sickness. The welfare department of Shiawassee county placed a lien against the real estate owned by me and my husband for the debt. I learned about the lien in May of 1950. They wrote and told me the amount we owed them and said something about going to put a lien on our property but we did not understand it that they already put it on. I first understood they placed a lien against our real estate in October of 1950. The lien was later discharged in October of 1950 but I cannot tell you the exact date. Mr. W. F. Roby paid $325 to get that lien discharged. Mr. Roby paid the $325 to the welfare department. * * *

"Mr. Roby eventually bought our contract upon this real estate and after he bought the contract he charged us with the $325 paid by him to the welfare department."

We note that there is no claim made, nor does the record show, that Mrs. Allen at any time had any part in making the agreement with Kurrle to discharge the lien on the property owned by herself, and husband. It clearly appears that the agreement as to what amount of money it would take to discharge the lien on the Allen property was made between defendant Kurrle and W. F. Roby, who testified:

"My full name is W. F. Roby and I live at 821 Corunna avenue, Owosso. My occupation is trading and working real estate. * * *

"In October of 1950 I took over a contract that Mr. and Mrs. Allen had; the real estate covered by this contract was located on the State road south of Corunna. It was a small 17-acre truck farm. I didn't complete the purchase of that contract from Mr. and Mrs. Allen. Mr. and Mrs. Allen signed their interest in the contract over to me in the last days of October of 1950. Before Mr. and Mrs. Allen signed over to me, in October of 1950, their interest in this land contract there were encumbrances against the real estate. There was a mortgage at that time owned by the Owosso Savings Bank. In my best judgment the mortgage was around $1,500 to $1,800. Other than this Owosso Savings Bank mortgage there was an encumbrance owing to the F.H.A. and also the welfare department. This welfare lien was in the amount of $688.

"It was agreed between Mr. and Mrs. Allen and myself concerning the purchase of the 17-acre farm that I was to take and pay up the debts and an agreement over taking over the deed to the property. The set price was to be consummated in the end of paying up the debts. Mr. and Mrs. Allen signed over their interest in the land contract without a definite price for the purchase of it because of the F.H.A. figures and other debts which we had to adjust where not correct. The set price was near $3,700, but I am not sure of the exact amount. The

F.H.A. mortgage was supposed to be somewhere about $800. I was supposed to pay Mr. and Mrs. Allen the difference between the agreed price of $3,700 and the money necessary to pay the 2 mortgages and the welfare lien.   *   *   *

"The welfare lien of $688 was removed in October of 1950.   *   *   *

"In order to obtain the discharge of the lien I dealt with Mr. Harry Kurrle. My dealings took place in October of last year.   *   *   *   The check stated on it at that time 'Payment in full of the John Allen account.'   *   *   *

"Q. After you handed Mr. Kurrle this check, after it was signed on that particular day, was it your understanding that the Allen account was paid in full then at that time?

"A. The Allen account was paid in full.

"Q. Yes, was that your understanding at that time?

"A. The release was to be made for that amount.

"Q. And was it your understanding that the account was paid in full when you signed that check?

"A. Yes, sir, that is what it was paid for, to release it at that time.

"Q. And after the welfare lien was discharged, then you completed the transaction of purchase, that is right, isn't it?

"A. That is right.

"Q. And at that time you became the owner of the Allen contract interest in this particular 17 acres?

"A. That is right.

"Q. After that discharge of the welfare lien was in the possession of the bank and the real estate purchase was completed, was it your understanding that at that time your business with the welfare department had come to an end?

"A. No.   *   *   *

"I have lived in the county since 1931 and I do a little real estate business. The transaction was

not complete between myself and the Allens. There was a difference in the F.H.A. which had not been completed. There was more of the F.H.A. than there was supposed to be. In paying that up I had to pay the whole thing on both parties in order to get it adjusted between the Allens and myself. That is our own business and our own affair, it hasn't been completed.

"The amount owing on this property was more than I thought it was when I made the transaction with the welfare department. I went to Mr. Kurrle about October 23d, in the courthouse and talked with him about this lien. I told him it was a complicated deal, I didn't know just how we would come out on it. We talked it over and then making the decision he told me what it would take at the present time. He said $325 would take care of it at time and see what we could do following; I said there was an F.H.A. and I don't know just how much that was going to be so he wrote the check himself for the amount. I asked him to write a check to himself or whatever it wanted to be. He didn't write the check to himself. I don't know where the check is at this time.

"At the time I went to the courthouse to talk to Mr. Kurrle I didn't know exactly how much of a lien had been placed against this property. I knew it was somewhere near $688. When I came over to see Mr. Kurrle at the courthouse the talk was that they had been deciding to discount for this amount, according to what there was, the balance that the people could stand, and we discussed it. They couldn't at the time take care of anything at all. At that time Mr. Kurrle said 'I don't know nothing about it, I just put the lien on there at that time, knowing nothing about it.' Mr. Kurrle didn't know nothing about the Allens and I never met Mr. Kurrle before. We talked it over in a business way and decided. He had already released the lien when he knew I was coming over, I talked to him on the phone. I was to pay him $325 at that time. I ex-

plained to him that there was a mortgage to the Owosso Savings Bank between $1,500 and $1,800. We didn't exactly have the amount. I explained to him that there was an F.H.A. mortgage owed by the Allens of about $800. I found out that there was a lot of other indebtedness besides that and the F.H.A. ran up to near $400 more.

"Now in making this transaction with Mr. Kurrle I asked him to hold the check for a few days.

"At a later date did you meet Mr. Kurrle again? Yes, sir. At that time I informed him that the F.H.A. mortgage was more than I thought it was and I also informed him that it looked like I was going to lose money in taking the property over. Mr. Kurrle said he would see what he could do about holding back part of the $325 to see how I came out.

\* \* \*

"In my talk with Mr. Kurrle after I found I was going to lose money on the deal, that I couldn't sell the property, practically one-third of the amount was to be held back. I have endeavored to sell the property but have not been able to sell it for enough to pay the mortgage, the F.H.A. and the $325 check that I drew."

It clearly appears from the above testimony that in October, 1950, Roby and defendant Kurrle entered into an agreement whereby Roby was to pay the sum of $325 in full settlement of the lien on the Allen farm; that Roby gave Kurrle a check in such amount, payable to Shiawassee county welfare department, and that later the agreement was modified to the extent that practically one-third of the amount of the check for $325 was to be held back until such time as Roby could sell the property, and that the Allen property has not as yet been sold.

Under these circumstances the ownership of the $105 cannot be determined until such time as the Allen property has been sold. It clearly appears that at the date of the modified agreement, or at the

date of the trial, the Shiawassee county welfare department was not the owner of the $105. At most it was only a contingent owner. The motion to dismiss the case made at the close of the people's proofs should have been granted. It follows that defendant's sentence and conviction must be vacated.

Under our decision, other errors charged by defendant need not be considered.

ADAMS, C. J., and DETHMERS, BUTZEL, CARR, BUSHNELL, BOYLES, and REID, JJ., concurred.